With that, we're ready to proceed. And we will take a 10-minute break following argument in the second case. So with that, counsel, you may proceed. Mr. Tanner? Good morning, Your Honor. May it please the court. I was getting a little feedback there, but I think the issue's fixed, so I'm going to proceed. Thank you, Judge. My name is Spencer Tanner. I represent the Rexing Quality Eggs, Joe Dillon and Leo Rexing, collectively the Rexings. We're their appellants in this case. Appellants in this case, you crossed out the leads. It's Rembrandt's appeal. I'm going to jump right into the Rexing's appeal arguments. If you have any questions about the facts, please let me know. The Rexings are appealing three issues. First is whether substitution under the CERBES rule provided Rembrandt the ability to inflate its damages under the resale method, which is 2706 of the SEC. Second is whether Rembrandt presented any evidence of trial that the eggs conform to the case weight specification under the contract. The third is whether the district court erred in allowing Rembrandt to seek the market price remedy under 2708 for a good that reused itself. For the substitution issue, we're appealing the district court's partial summary judgment order, which found liability in favor of Rembrandt against Rexing's score under the contract. The district court found there were 198 egg loads remaining on the term of the contract. Of those 198, 133 of them were resold to third-party bonafide purchasers. Of the 133, 45 were sourced from locations other than the location that the Rexings were to get the eggs under the contract. The resale method is seller's main remedy under 2703, which provides for seller's remedy upon a buyer breach. 2706 is really seller's main remedy for existing goods. It provides a difference between the contract price, the resale price, plus incidental damages. On summary judgment, the court said the prevailing rule as to fungible goods, the UCC does not necessarily require the resold goods be the exact goods that were refused by the buyer, but the resale must nevertheless be reasonably identified to the broken contract. Our issue with that ruling is post-repudiation, Rexing's repudiation, Rembrandt reduced the supply that was supposed to come to the Rexings as a result of something that's respiratory disease, MG. And it really wasn't a de minimis decision that they made. We're talking about a quarter of a million birds that were culled. So that really is the underlying factual issue that gets to our legal question. In this context, we believe there's three problems with substitutions in this case. First, the resale method really functions as an evidentiary tool for the non-Rexing party. Second, really what you're looking at is a substitute transaction to replace what should have happened in the contract, with the point being put the buyer or the seller in a position as if the buyer would have fully performed. Our belief is when the originally identified goods do not come into existence, there's no need for a substitute transaction. And in doing so, substituting the transaction, you're actually creating damages where they don't exist. The substitution rule comes from CERBES Foods, which is an Illinois Court of Appeals case from 1980. In the case, there was a designated lot of meat, 200,000 pounds of meat, which is, pun intended, a lot of meat. Upon the buyer's breach, the seller actually sold a different lot of meat that was the same quantity, quality of the designated meat. And the court looked at this issue. It said the concept of identification in the UCC is limited. Identification is the process by which goods are linked, set aside, or otherwise designated as those to which the contract refers. The court analyzed the issue and found that goods identical in quantity, quality, and description were in and of themselves the goods identified in the contract. Now, the Seventh Circuit looked at the CERBES rule and said, we agree with the holding. However, we disagree with the reasoning. In fact, the Second Circuit in Apex Oil said the CERBES court's view of substitution, really, of identification defies common sense. The court viewed substitution as two acts, originally identifying the goods in the contract and then re-identifying the goods for purposes of resale. If you look at this case in that light, I think it's really the distinguishing factor. Rembrandt originally identified tipped-in eggs and directions were to receive those post-repudiation. Something happened at the facility. They made a decision. And they re-identified eggs from other existing producers and sold to third-party buyers. And in doing so, substituted something for nothing. So if you look at every substitution case that's out there, the sellers are substituting something for something. In CERBES, the meat was sitting in cold storage. At Apex Oil, the heating oil was sitting aboard a boat in the Boston Harbor. Martin Marietta, the case we cited, was a plump, full pile of sand, which is existing. Wisconsin cranberries, again, there was harvested cranberries sitting in cold storage. So every seller substitutes something for something in that case. Here, basically, there's a substitution of something for something that didn't exist. To illustrate this point, we cited Knobb's Chemicals, which is really a 2708 case. A jobber, which is somebody that buys goods, resells them, the Fifth Circuit said, because the jobber, the reseller, never acquired the goods, the resale method was unavailable to it. Related to this point is our second issue, is of an issue under 2704. 2704 is a more specific provision relating to unfinished or incomplete goods. Subsection 2 says the seller can either complete manufacture or wholly identify the goods, or cease manufacture and resell the goods for scrap or salvage value. Now, the district court's order cites the 2704, actually, to comment 2, but the site is only related to Rembrandt's decision to complete manufacture. Rembrandt made a decision post, upon recognition, Rembrandt had a long-term goal to keep these eggs in place. It was getting into the cage-free market. We were fine with that. We never have made the argument that Rembrandt should have reduced its supply, just as a matter of fact. But when they did reduce the supply, regardless of the circumstances, we believe wreckings are entitled to that. It's essentially a mitigation argument. Wreckings are entitled to the credit for the reduction of supply. They can't go out and re-identify other goods to create damages where they don't exist. We decided to defer with a manufacturing case for this point. It's a distinguishing factor with machines that the seller made a decision to complete. It substituted parts. That's not, again, what we're talking about here. There's something for something there, again. The third point, we believe, is that substitution in the context of this case is kind of contrary to the traditional contract law principles, namely causation. Causation is an essential element of contract, breach of contract action. Iowa courts have said damages require nexus with the breach. Damages recovered for breach of contract are limited to those losses actually suffered by reason of the breach and must relate to the nature and purpose of the contract. Of course, the UCC is supposed to incorporate these contract principles. However, we believe the court has applied them independently. And we cited to Wisconsin Knife Works 781 FQD 1280. It's a Judge Posner case out of this court where he applied a causational contract principle to a UCC case. Another case we cited was out of the Second Circuit. So we believe that the court should reverse the district court's partial summary judgment ruling on the substitution issue. The second issue on appeal is the conformity issue. Rembrandt Board of Verdant approved under 2706 to show that the eggs that resold were in conformity with the contract. On exhibit A was the specifications of the contract. The main specification for the eggs, because Rexon was getting the eggs to grade them and kind of resell them as whole eggs, as cage-free whole eggs. The main specification was that each case of eggs used to be between 47 and 52 pounds. The reason for that is eggs come in different sizes. You go to the grocery store, you get jumbo, extra large, large. Somebody that's selling eggs in bulk wants kind of a happy medium between all of the egg sizes. So we don't believe that trial. Counsel, did the eggs from Tipton have any particular weight? Jumbo or whatever? Well, so we're talking about, so each load of eggs, each trailer load is 900 cases. A case is 30 dozen. So we're talking about a very, very massive amount of eggs. And multiply that by 198. So it is, admittedly, a lot of eggs. So no, birds lay the eggs in different sizes. So really what you want is big eggs, small eggs, everything combined in each case should weigh between 47 and 52, because that gives you the ability to sell them as, you can kind of sort them out and sell them as this or that. And so, no, there was no specific difference between Tipton eggs and anybody else. But what we believe was kind of a factual problem is when Brimberry sold the goods, there was no evidence that they even looked at case weights, really for two reasons. First, they said they have a system in place to check this. You know, we didn't have, there was no evidence presented. The second issue is they said that, well, none of these third-party buyers complained about it. Well, the main issue is the third-party buyers, if you look at them, they're egg breakers. We were buying them to resell them as whole eggs, shell eggs,  but we didn't have any evidence. The third-party buyers mainly were egg breakers. They break it from liquid. They don't care about the weight. They don't care about quality, really. They're just co-mingling all the liquid together. So that was our factual issue, and we believe we filed, or we made a Rule 50 motion, which was denied, renewed it, which was denied at trial. The third issue on appeal is Rembrandt's ability to seek damages under the market price approach, 2708. We believe that's a pure question of law. Rembrandt filed a declaration in support of its summary judgment, which stated, for 65 of the 198 loads, Rembrandt itself reused the eggs by breaking them and processing them into liquid and powder products. In these instances, Rembrandt had an existing need for cage-free eggs to supply its liquid and powder egg customers. If Rexing had not repudiated the contract, Rembrandt would have resold these goods to Rexing at the contract price, and then bought eggs at a lower market price. The prices of eggs charged to the Rexing fleet, 65 loads, were the actual market prices at which Rembrandt was able to sell loads to third parties at the same time. Rembrandt called this, at trial, the Rexing formula. The problem with the Rexing formula, well, there's really two problems. It's not really a 2708 remedy. It's a 2706 resale where Rembrandt is the seller and the buyer. The main issue is there's a kind of an error and assumption in this formula. The fact that Rembrandt, that Rexing breached, and Rembrandt had an existing need for eggs, they obviously didn't have to go out to the market and buy anything. So we believe that the market, the Rexing formula that they have used is kind of illogical and doesn't get to the real damage that occurred. The second issue is Rembrandt used its own sales to third parties as a measure of damages or what they would have gone out to the market to buy eggs. Again, a lot of these sales were to breakers. It's really a difference between case-free eggs which were higher quality and something that were just broken for liquid. I'm gonna jump to Rembrandt's appeal real quick. The free judgment interest issue. Usury requires four elements, loan or forbearance, an agreement for principal to be payable absolutely, exaction of profit greater than allowed in the intent. The issue that the district court had to decide, which was briefed multiple times, was whether Rembrandt fell into the business credit exception. On page 12 of the district court order, it looked at the logistics of the transaction, the payments of the transaction, and then concluded on page 14, the agreement did not call for a sale of goods on credit, rather it established a delayed payment mechanism due to the unique nature of the party's agreement. That is not a strictly legal question. So we do not believe the no vote review should be applied. At the very least, it should be a clear error due to mixed questions of law and fact. Rembrandt relies on this Krasinski case which interpreted an insurance contract. The court wasn't really interpreting the supply agreement. They had a provision for interest in it. That was pretty clear. So for that reason, I'm gonna let, reserve my remaining time for rebuttal and let Mr. Beaudry speak. Thank you, counsel. Mr. Beaudry. Good morning, your honors. May it please the court, can you hear me all right? Yes, we can, I can. Thank you. Alain Beaudry of Rembrandt Enterprises. I have very few comments that I need to make concerning the Rexing's appeal from the jury verdict. All of their arguments boiled down to the claim that Rembrandt did not act in a commercially reasonable manner or in good faith in claiming his damages about $480,000 for the resale of eggs that came from non-Tipton farms. Under section 2706 of the UCC, it's well settled that a seller may substitute fungible goods identified to the contract so long as the goods are truly fungible and the resale itself is commercially reasonable. And that's the so-called serve breast rule. And my paraphrase of it actually comes right out of the Sixth Circuit decision addressing what the serve breast rule means, Firewood Manufacturing Company v. General Tire, 96F3D163. The jury here necessarily determined that Rembrandt's resales for which they awarded damages were commercially reasonable. That's what the trial was about. And they also determined that the resales were in good faith. The issue of whether a sale is commercially reasonable in good faith is quintessentially a question of fact. And that's what the Rexings repeatedly told the district court and which the district court expressly found at page 39 of the court summary judgment decision. That's why essentially what the court said is we're granting summary judgments on Rembrandt's claim that the Rexings breached the contract without justification but the Rexings raised material issues of fact as to whether Rembrandt acted in a commercially reasonable manner and in good faith, specifically including this issue of the non-tipton eggs. And that's what the trial was about. And so while it's dressed up in a little more formal legal argument, the argument which my respected adversary made to your honors is pretty much the exact same closing argument that his co-counsel made to the jury. They argued the facts skillfully and vigorously to the jury that Rembrandt acted in bad faith and that its resales weren't commercially reasonable or in good faith and they lost. The Rexings did not bring a motion for a new trial and under this court precedent and the Supreme Court precedent cited in our brief, that means that they have waived the right to challenge the sufficiency of the evidence. There aren't that many cases discussing the serve rest rule but one which my adversary cited is the apex oil case out of the second circuit. And that's a pretty interesting case. And there, it's a little convoluted but it essentially involved one shipments of oil, 48,000 tons of oil that the buyer refused to take. And in the facts of that case, the seller sold those 48,000 pounds to another buyer the very next day and then waited, then there was some negotiations between the parties and they had a settlement agreement and the seller claimed that the settlement agreement did not resolve the issue of the buyer's liability for the remaining 48,000 tons of oil that the buyer hadn't taken. And then resold the 48,000 tons to another buyer about six or eight weeks later at which time the market price had dropped. And so the second circuit in that case said, look, you're just ginning up a damages claim by acting in bad faith. You actually resold the eggs, the oil the next day and you suffered a nominal loss and we're not gonna allow under those circumstances you to basically play the markets and then wait until it dips. This case is completely unlike that case because in this case, we're not dealing with just one shipment of eggs. We're talking about 3,400,000 eggs each week. And Rembrandt was left in the very unenviable position and this is all on the record about how you go about selling 3,400,000 cage-free eggs a week when there's no defined market. These are called specialty eggs. And they explained to the jury how hard it was and how difficult and everything. And the point is that the jury heard all that evidence, weighed the evidence and concluded that Rembrandt had met its burden. With the court's indulgence, then I'm gonna turn to the issue on our cross appeal. And that issue is whether the party supply agreement is usurious under the Iowa usury statute. And respectfully, that is an issue of statutory construction under the Iowa credit code and contractual interpretation. And that's purely an issue of law reviewed de novo and we cite the cases in our brief. Recall, your honors, that the supply agreement was negotiated at arm's length over several months between very sophisticated parties. And the court summary judgment decision at page 10 sort of details the history of some of those negotiations. In the contract, the Rexans agreed to buy 3.4 million cage-free white eggs a week, worth over 200,000 for each weekly shipment at the contract price of 95 cents a dozen. And they agreed to do that for an entire year. And the way the contract worked was the Rexans would pick up the eggs each week to have them graded, but only paid for them later. And economic common sense tells you, if you're a seller and you give a buyer $200,000 of merchandise week after week, but you don't get paid until later, that you're incurring credit risk because you are effectively extending credit until you get paid. And that's why, in this case, not surprisingly, Rembrandt required the Rexans to fill out a credit application as part of the contract so they could determine whether the Rexans were credit worthy. Paragraph E of the supply agreement says payment terms are 21 days net from invoice date. And past due invoices are charged 1% per month. But an invoice is not past due until the expiration of the 20 days, am I right? That is correct. So they have- That's really a period for inspection of the eggs. They, that's simply, they have 21 days to pay the invoice and it's not past due until 21 days. And yes, there was a mechanism in the contract where there was an inspection, but the fact is that they don't get charged 1% until 21 days past the invoice. Hard time seeing how that first 20, 21 days is considered to be a credit arrangement. It seems to me the sale really isn't completed until the purchaser has had a chance to inspect the eggs, determine which ones are not acceptable and an actual price is determined. And that's why they're not charged. I apologize, Your Honor. Let me know when you're done. I'm sorry. Well, it just seemed to me that until we know what the price is for the shipment, you know, the delivery's not complete. Right, right. And that's why they're not charged interest during the 21 day period. The interest charge only begins to run 21 days after the invoice. But the fact is that if you don't get paid on the 22nd day, you've extended credit under Iowa law. And the real problem with the court, the district court's decision, and it came up in an odd procedural posture because the district court, Sue Esponte, in response to our post-trial motion for attorney's fees and interest, Sue Esponte raised the issue of usury and allowed us to submit one five-page brief. At the time, the Rexings had agreed and affirmatively asserted that Rembrandt had extended credit and satisfied the first element of the usury statute. And then, so we just briefed the issue of the business credit exception, and we never really, there really wasn't any briefing to the district court as to what constitutes an extension of credit. And if you look at the district court's decision, there is no discussion of what constitutes an extension of credit under Iowa law. But what's interesting is if you look at the business purpose exception, just give me one second. The business credit exception actually gives a safe harbor to three categories of persons. And it evidences that the Iowa legislature wanted to get out of the way of business-to-business transactions like this one. But there is a third category of persons who are entitled to the safe harbor, and it's certain types of consumer credit transactions in excess of the consumer credit amount under the Iowa Consumer Credit Code. And the Iowa Consumer Credit Code defines credit, and it defines credit as the right to purchase property and defer payment, therefore. And so, right within the business credit exception, you have a definition of credit as to one of the three categories of people. And that's exactly what the Rexings had. They had the right to buy the eggs, they took delivery of the eggs, they took title to the eggs, and deferred payment. And that's the exact same test that the Iowa Supreme Court applied in Yonkers. So, to suggest that one category of persons under the business credit exception, credit is defined as the right to purchase property and defer payment, therefore, but that there's some different test that applies to business-to-business transactions doesn't make any sense. If the test is, and I think it's very clear under Iowa law it is, that the right to purchase property and defer payment is an extension of credit, then, by definition, the Rexings, who are very sophisticated businessmen, millions and millions of dollars in assets, who negotiated a business agreement that they admit was for a business purpose, clearly fall within the safe harbor. And the Iowa legislature sort of emphasized that they don't want courts to regulate business-to-business transactions, because there are a number of provisions, not only the safe harbor exception, but the people who enter into business-purpose transactions are actually statutorily enjoined from even raising the usury defense. And so- Shouldn't that be your basic point? This is a transaction among sophisticated business people. It's not subject to the statute. Exactly right. And there was no dispute, Your Honor, below that the Rexings entered into this agreement for a business purpose. So these are not widows. These are not orphans. These are not consumers. These are highly sophisticated businessmen. And the language and structure of the Iowa Usury Code makes clear that the Iowa legislature did not want that kind of transaction to be subject to the scope of the code. And every single Iowa decision since the ninth, there was an amendment in 1980, and there was one Iowa Supreme Court case, I think it's called Mucho More, which is from 1982, but it actually deals with the 1978 version of the statute. That's why, in our brief, we were careful to say that every decision in the last 40 years applying the post-1980 Iowa Usury Code, which our case falls under, essentially says if this is a business to business transaction, it just does not fall within the scope of the Iowa Usury Code. And that's exactly what the Iowa legislature intended. And so the flaw in the district court's order is that Judge Magnus Dinsen acknowledged the business purpose exception. But essentially, if you read her opinion, what she did was she compared the payment mechanics in our contracts to the payment mechanics in two other Iowa cases. And she said, well, it's different. This was a 21-day period. But why there is a payment delay is not the test in Iowa for what constitutes the extension of credit. And it's simply whether or not they receive goods and are entitled to defer payment. So a get goods now, pay later regime, which clearly the supply agreement is, is by definition and as a matter of law an extension of credit and subject to the safe harbor. Unless you're honest. Why is that important to your case? To me, if you don't fall under the statute, you don't have to worry. That's right. It's important to our case because, and with all respect to my colleague, who's a skilled and very, very good lawyer, his clients are extremely litigious, made the case extremely expensive. This is the second trip to the Seventh Circuit in this case. We tried to bring a summary judgment motion and get the whole case resolved. They skillfully argued that there were fact issues. So they forced the Rembrandt to go through our paces. And the legal fees and prejudgments interest are staggering. They're at this point over a million dollars. And so why it's important to our case is because in this case, the parties agreed that there would be attorney fees and prejudgment interest to the prevailing party. We are the prevailing party and it's a very significant economic issue. Unless your honors have further questions for me, that concludes the comments that I wish to make today and appreciate very much your patience and attention to the case. Thank you, Mr. Baudry. Senator. Thank you, Judge. I've got a lot to rebut here. I think what Mr. Baudry said last kind of segues me into my response to his new trial argument. I don't put any stock into that. First of all, the substitution issue is a question of law. The facts are established that the lobes did not come from this place. And the court can look at the appellant's attendance for those lobes. The issue that went to trial was commercial reasonableness. That did not get to really what we're talking about here today. We could not appeal the court summary judgment order because it was a partial summary judgment order. It was not a final order under rule 54B. There was no magic language in it that allowed us to appeal at that time. So we've been waiting for this for two years. Commercial reasonableness, you can get the definition from the district court in final jury instruction number 15, only looks at the method, manner, time, place and terms of the resales. So if you look at that definition, that only looks at the subjective nature of each resale. What we're talking about here is a macro level. They are replacing something for nothing. They are creating damages that don't exist. So that commercial reasonableness doesn't get to what we're talking about. The second issue, if you look at the same jury instruction, the court instructed the jury, Rembrandt was permitted to depart from the terms and conditions of the contract to the extent the departure was commercially reasonable. So it almost gives Rembrandt credence to say, well, these resales subjectively looked reasonable, therefore we can get damaged for these. Our question of law is not strictly a commercial reasonableness. And the fact that we argued it consistently throughout the case trial isn't a waiver of anything. We're just arguing our point consistently. And so I don't put much stock into that. I wanna get to the pre-judgment interest issue. We brought that up. You can look at the pre-trial conference. The party agreed to push that till after trial. So the court didn't do sponsor do it. At the same time, the Rembrandt agreed at the pre-trial conference to drop its credit application claim. It had a separate breach of contract claim from its credit application claim. After trial, the credit application claim reared its head at the pre-judgment interest. The third party buyers purchased these eggs from Rembrandt. So we're only talking about interest for amounts that Recton were supposed to pay, but the Recton didn't receive these loads. So it doesn't make sense that they were on credit. The issue under the title code statute says, no personal child directly or indirectly receiving money or anything in any manner at a greater sum of value or loan of money or a contract founded upon a sale of real or personal property. So it includes business transactions, except for under 535.22, business loans or credit. So business transactions fall under the usury statute. That's just, I mean, that young brother says that. And we did not agree that this is on credit. We agreed that there was a forbearance, which is required for the first element of usury. Forbearance does not necessarily require a loan of money. It generally signifies giving a time for a payment of debt. That's Younger Brothers. Younger Brothers overturned the time price doctrine under Iowa law. We don't believe that a debt can be a forbearance, but it doesn't have to be credit. And that's all my time, thanks judge. Thank you, Mr. Tanner. Thanks to both counsel and the case will be taken under advisement.